**United States District Court**
**For the Northern District of California**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE ANTONIO HERNANDEZ, | No. C 07-3778 MMC (PR) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY** |
| v. | |
| JAMES E. TILTON, Director D.O.C. | |
| Respondent. | |

Before the Court is the above-titled petition for a writ of habeas corpus, filed July 23, 2007 by petitioner Jose Antonio Hernandez pursuant to 28 U.S.C. § 2254, challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, and petitioner has filed a traverse.

## I. PROCEDURAL HISTORY

In 2005, a Monterey County jury found petitioner guilty of attempted murder of a peace officer, as well as attempted murder, assault with a firearm on a peace officer, exhibiting a firearm at a peace officer, and possession of a firearm by a felon. (People v. Hernandez, No. H029509 (Cal. Ct. App. Jan. 29, 2007) (hereinafter "Ex. B") at 1, 6-7.)[1] The trial court sentenced petitioner to 43 years to life in prison. (Id. at 2.)

---
[1] All references to exhibits herein are to exhibits submitted by respondent.

In a reasoned opinion, the California Court of Appeal modified the trial court's judgment and affirmed. (Id. at 2.) Although the Court of Appeal determined the evidence was sufficient to support the jury's conviction of attempted murder of a peace officer, it vacated the conviction of attempted murder, which had been submitted to the jury as a lesser included offense. (Id. at 2, 13.) The California Supreme Court summarily denied the petition for review. (Ex. C.) Petitioner did not seek state habeas corpus relief.

On July 23, 2007, petitioner filed the instant petition for a writ of habeas corpus.

## II. STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows:

*The prosecution's case*

Around 6:30 p.m. on October 22, 2004, the two cashiers at the San Lorenzo Liquor Store in King City were robbed of over $10,000. The robber had a dark tattoo on the back and side of his neck. He held a .38 caliber revolver and was wearing black pants, a dark blue or black long-sleeved shirt, black leather gloves, and a ski mask. One of the cashiers told the police officer who responded to the report of the robbery that the robber reminded her of a regular customer of the store named Tony. The cashier identified [petitioner] at trial as that customer.

Parole Officer Terry Davis received a telephone call on November 30, 2004, from Investigator David Norum from the Monterey County District Attorney's office informing him that [petitioner], a parolee-at-large from Southern California, was in the King City area. Davis gathered more information on [petitioner], including pictures of [petitioner] and his tattoos, and took the information to his supervisor, parole officer Donald Bottorff. Officers Davis and Bottorff decided that they, along with parole officer Ben Jimenez, would attempt to locate [petitioner] and take him into custody. The officers, who were not in uniform, drove an unmarked Jeep Cherokee to King City around 10:00 a.m. that same day.

After informing the King City Police Department of the reason for their being in the city, the officers drove by the address for [petitioner] that had been given to them. There, Officers Bottorff and Jimenez saw [petitioner] standing outside talking with an individual in a parked car. Officer Davis drove up the block, made a U-turn, stopped and parked the Jeep. After the officers decided to attempt to apprehend [petitioner], Davis drove back and parked in front of [petitioner's] residence. All three officers got out of the Jeep and walked towards [petitioner]. Davis said that he was lost and asked [petitioner] for directions. [Petitioner] stopped his conversation and walked towards the officers. [Petitioner] started to give Davis directions, gesturing with his left hand while keeping his right hand in the pocket of his sweatshirt.

Officer Jimenez called [petitioner] by name, and [petitioner] stopped and

looked at Jimenez. Officer Davis said, "'state parole, you're under arrest,'" and reached for [petitioner's] right arm. Officer Bottorff grabbed [petitioner's] left hand and twisted it behind [petitioner's] back. [Petitioner] said, "'You're not taking me,'" and turned away from the officers so that his back was to them. Jimenez, who was on [petitioner's] right side, grabbed [petitioner] around the neck and Davis grabbed [petitioner] by the waist. Jimenez pulled [petitioner] towards him and all four men went down to the ground. [Petitioner] landed on top of Jimenez, and Davis and Bottorff were on top of [petitioner]. [Petitioner], Davis and Bottorff immediately got back up. [Petitioner] stood bent over at the waist and with his legs bent. He attempted to pull away from the officers. Davis and Bottorff yelled, "'relax,'" and "'don't fight.'"

Officer Davis grabbed [petitioner's] left ankle, pulled [petitioner's] leg up to his buttocks, grabbed [petitioner's] belt, and shoved [petitioner] in an attempt to get him back to the ground. Officer Jimenez, who was in front of [petitioner], also tried to grab [petitioner]. [Petitioner] continued to struggle in an attempt to get away, but he, Jimenez and Davis fell to the ground. Officer Jimenez was on his back, [petitioner] was on top of Jimenez facing him, and Davis was on top of [petitioner]. Officer Davis rolled over onto his back so that he could watch the parked car while still staying on top of [petitioner]. Officer Jimenez told the other officers to spray [petitioner], so Officer Bottorff, who was at his side still holding on to [petitioner's] left hand, sprayed [petitioner] in the face with pepper spray. [Petitioner] said, "'fuck it, you won't take me.'"

Officer Jimenez saw [petitioner] bring his right hand out from underneath him. [Petitioner] was holding a gun as though to shoot it. Jimenez yelled, "'gun.'" Four or five times, [petitioner] tried to point the gun at Jimenez's head but Jimenez pushed it away. Jimenez testified that [petitioner] had the opportunity to drop the gun each time Jimenez pushed it away but [petitioner] did not do so; instead, each time [petitioner] tried to push the gun back to Jimenez's head. Jimenez also testified that, while it seemed to him that [petitioner] could have pulled the trigger at any time, in fact [petitioner] might not have had a good grip on it. At one point the gun did touch Jimenez's head. Fearing that he would be killed, Jimenez pushed himself out from underneath [petitioner], stood up, and told the officers to spray [petitioner]. Officer Bottorff pepper sprayed [petitioner] a second time and [petitioner] screamed.

Officer Bottorff could then see that [petitioner] was holding a gun in his right hand as though to shoot it. Bottorff said, "'He's got a gun.'" Bottorff pinned [petitioner's] right hand to the ground, raised it up, and hit it against the ground again in an attempt to free the gun from [petitioner's] hand. [Petitioner] released his grip on the gun. Officer Jimenez picked up the gun from the ground and saw that it was loaded. He then set it aside and assisted Bottorff in attempting to handcuff [petitioner]. [Petitioner] stopped resisting, so Bottorff pulled [petitioner's] hands behind his back and Jimenez handcuffed him. Officer Davis got up off [petitioner]. Jimenez told Davis that [petitioner] had pointed a gun to his head and handed Davis a .38 revolver. Davis put the gun in his pocket. A holster for the gun was found in [petitioner's] right front pocket.

Officer Davis called the King City police and gave [petitioner's] loaded gun to Officer John Peters when he arrived. Peters unloaded the gun. After

3

[petitioner] was placed in a patrol car, a ski mask and gloves were found in his front pockets. [Petitioner's] wallet, driver's license, and items with gang indicia were found during a search of [petitioner's] bedroom at the residence. No cash was found either on [petitioner's] person or in his bedroom.

King City Police Officer Mark Baker testified that he is his department's gang officer. Baker testified that King City is mainly a Sureno gang town. In his opinion, [petitioner's] tattoos are Sureno gang-related, which means that [petitioner] is a gang member and not just an associate or "wannabe." Some of the items seized from [petitioner's] bedroom were Sureno gang-related. [Petitioner] told jail officials that he was a Sureno gang member and he was placed in the housing unit for active Sureno gang members. In Baker's opinion, [petitioner] is an active Sureno gang member. In addition, in Baker's opinion, both the offenses on October 22, 2004, and the offenses on November 30, 2004, were committed in association with, or for the benefit of, a criminal street gang.

*The defense case*

Evangelina Ganoa, [petitioner's] niece, testified that [petitioner] has been in King City since early 2004. He was at her house on October 22, 2004, between 4:00 and 5:30 p.m., talking with her about her daughter's birthday party. Her house is about one block away from the San Lorenzo Liquor Store. Around 5:30 p.m., Ganoa gave [petitioner] a ride to Lynn's liquor store, where they waited for [petitioner's] girlfriend Maria until about 6:00 p.m. After Maria arrived, Ganoa drove [petitioner] and Maria to the Motel 6 in King City. She left them at the motel around 7:00 p.m. On cross-examination, Ganoa testified that her two brothers and her boyfriend are all Sureno gang members.

Maria Martinez, [petitioner's] girlfriend, testified that she arrived back in King City from school in San Jose around 5:45 or 6:00 p.m. on October 22, 2004. She met [petitioner] and his niece at the bus stop in front of Lynn's liquor store. They spent time in the store and then, around 7:00 p.m., [petitioner's] niece drove them to the Motel 6. On cross-examination Martinez testified that her brother is a Sureno gang member and that she considered herself a Sureno gang member when she was 16 years old, but she has changed her life because she now has a daughter.

(Ex. B at 3-6 (footnote omitted).)

## III. DISCUSSION

A. <u>Standard of Review</u>

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); <u>Rose v. Hodges</u>, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's

4

adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect on the verdict." Penry v. Johnson, 532 U.S. 782, 796 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Id. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, the California Supreme Court summarily rejected the single claim petitioner raises in the instant petition (Ex. C); the Court of Appeal, in its opinion on direct review,

1 addressed that claim (see Ex. B) and thus was the highest court to have done so in a reasoned

2 decision. Accordingly, it is the Court of Appeal's decision that this Court reviews herein.

3 See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085,

4 1091-92 (9th Cir. 2005).

B. <u>Petitioner's Claim: Sufficiency of the Evidence</u>

Petitioner contends there was insufficient evidence to support the jury's verdict of attempted murder.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). Consequently, where a state prisoner alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt, such petitioner states a constitutional claim, Jackson v. Virginia, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, id. at 324. For purposes of determining such claim, the relevant inquiry is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). Where the record supports conflicting inferences, a federal habeas court must presume the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution. Id. at 326. Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. Id. at 324.

By the instant petition, petitioner argues that the evidence cannot support his conviction of attempted murder of a peace officer and that the Court of Appeal erred in affirming his conviction. Under California law, the prosecution must prove that: (1) "[t]he defendant took at least one direct but ineffective step toward killing (another person/ [or] a fetus)"; and (2) "[t]he defendant intended to kill that (person/ [or] fetus)." CALCRIM No. 600 (brackets in original) (citing Cal. Pen. C. §§ 21a, 187; People v. Guerra, 40 Cal. 3d 377, 386 (1985)). Because there rarely exists direct evidence of a defendant's intent, "such intent

6

must usually be derived from all the circumstances of the attempt, including the defendant's actions." People v. Chinchilla, 52 Cal. App. 4th 683, 690 (1997). To prove attempted murder of a peace officer, the prosecution additionally must prove that: (1) the victim "was a [peace officer] lawfully performing (his/her) duties as a [peace officer]"; and (2) "[w]hen the defendant attempted the murder, the defendant knew, or reasonably should have known, that [the victim] was a [peace officer] who was performing (his/her) duties." CALCRIM No. 602 (citing Cal. Pen. C. §§ 664(e), 830).

Here, petitioner contends, "the proof of both an attempt and an intent to kill was lacking." (Pet. at 7.) In that regard, petitioner asserts he "did no more than repeatedly point a gun at Jimenez," and that "there was no evidence of a direct act by [petitioner] that would have caused his death had it not been avoided by extraneous circumstances, nor of any act demonstrating a specific intent to kill Jimenez." (Pet. at 7-8.) Petitioner points to the fact that he never cocked the gun, attempted to pull the trigger, fired the gun, or made any threats to kill Jimenez. (Pet. at 8.) In support of said argument, petitioner cites to cases from other jurisdictions, in which the courts have held that pointing or aiming a gun at another person is not itself sufficient to constitute attempted murder. (See Pet. at 9-10.)

Petitioner misapprehends the scope of habeas review for sufficiency of the evidence. When considering a claim based on sufficiency of the evidence, a federal habeas court must "view[] the evidence in the light most favorable to the prosecution," Jackson, 443 U.S. at 319, and, in so doing, assumes the jury believed the evidence that supported guilt. See id. Here, that evidence included: (1) petitioner's stating "fuck it, you won't take me" (Ex. D at 192) while actively resisting arrest (id. at 110-14, 154-55, 190-91); (2) petitioner's holding a loaded gun in a "shooting grip" while struggling with the parole officers (id. at 157, 191-94, 196); (3) petitioner's repeated attempts to aim and place the gun at a parole officer's head while the officer repeatedly fought to push the muzzle away (id. at 194-95, 205); and (4) petitioner's membership in a gang (id. 391). This was sufficient evidence upon which a rational trier of fact could find the essential elements of attempted murder had been proved beyond a reasonable doubt.

As the Court of Appeal concluded:

> [Had] [petitioner] merely intended to incapacitate Officer Jimenez, he could have hit Jimenez with the gun or even shot him in his arm or leg. Instead [petitioner] repeatedly attempted to point the gun at Jimenez's head. [Petitioner's] repeated attempts to point the gun at Jimenez's head without firing a shot, which would most certainly cause a fatal wound, supports the finding that [petitioner] intended to kill Jimenez. Moreover, the jury could reasonably have found that [petitioner's] statement "you won't take me" and his failure to drop the gun when he had several opportunities to do so was consistent with that intent. That the circumstances might also support a contrary finding does not warrant reversal of the judgment.

(Ex. B at 12.)

Further, contrary to petitioner's contention, his argument is no more persuasive by reason of his inability to locate what he would consider comparable cases upholding a conviction of attempted murder. See Sarausad v. Porter, 479 F.3d 671, 678 (9th Cir. 2007), reversed on other grounds by Waddington v. Sarausad, 555 U.S. 179 (2009) (noting "absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness").

In sum, after a careful review of the record, this Court finds the state court's decision was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. Accordingly, for the reasons set forth above, the Court finds petitioner is not entitled to federal habeas relief on the grounds raised in the instant petition, and, accordingly, the petition will be denied.

C.  Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. See Rules Governing § 2254 Cases, Rule 11(a).

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a certificate of appealability (formerly known as a certificate of probable cause to appeal). See 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A certificate of appealability may be granted, "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected

the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing and, accordingly, a certificate of appealability will be denied.

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is hereby DENIED, and a certificate of appealability is hereby DENIED.

The Clerk shall enter judgment in favor of respondent and close the file. Additionally, the Clerk shall send a copy of this order to petitioner and to the Ninth Circuit Court of Appeals, from which petitioner also may seek a certificate of appealability.

IT IS SO ORDERED.

DATED: June 14, 2011

_____
MAXINE M. CHESNEY
United States District Judge